UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 02-420 |
| | ) | (RWR) |
| ROMAN JONES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Roman Jones was charged in a two-count indictment
with unlawful possession of a firearm and ammunition by a person
convicted of a crime punishable by imprisonment for one year or
more, and simple possession of marijuana.  Jones moved to
suppress at trial evidence recovered from his person and from a
subsequent search of the car in which he had been seated, arguing
that the evidence was the fruit of an unreasonable seizure of his
person.  Because the government has failed to carry its burden of
justifying the police officers' warrantless seizure of Jones
under the Fourth Amendment, by showing that it stemmed from an
encounter that either was consensual or was supported by
reasonable, articulable suspicion of criminal activity or
probable cause, defendant's motion to suppress will be granted.

## BACKGROUND

The evidence in this matter was adduced from Metropolitan
Police Department Officer Robert Cephas, Jr., the government's
sole witness at the hearing held on Jones's motion.  On May 8,
2002, Jones and another man, Lucas, were seated inside an
Oldsmobile Delta 88, parked in the area of the 100 block of Yuma
Street, S.E., in Washington, D.C.  Lucas was in the driver's seat
and Jones was in the front passenger seat.  (Tr. at 3-5, 7, 17.)
The Delta 88 was stationary in a vacant lot and was not parked
illegally.  (Tr. at 16, 17.)  The area of the 100 block of Yuma
Street is a "high narcotic area."  (Tr. at 7.)  It was
approximately 8:00 p.m., and it was not dark outside.  (Tr. at
17, 37.)

Cephas saw Lucas jump out of the driver's seat of the Delta
88 and walk away from the car very quickly.  (Tr. at 4, 7, 17.)
Cephas and Officer Schuler were approximately 40 to 50 yards away
on routine narcotics patrol.  (Tr. at 3, 5.)  Lucas' movement
aroused suspicion, and led the officers to conduct what Cephas
called an investigatory stop.  (See Tr. at 16-17.)  The officers
drove their unmarked police cruiser toward the Delta 88 and
stopped about 14 feet away, with the hood of the police cruiser
facing the hood of the Delta 88.  (See Tr. at 4, 17, 37-38.)  The
cruiser was recognizable as an unmarked police cruiser.  (Tr. at
14.)  Cephas and Schuler, joined by Officers Rollins and Huxoll,

walked at a quick pace toward the Delta 88.  It took the officers
about five to eight seconds to walk about eight or nine steps to
the car.  (Tr. at 38-39, 44.)[1]  Cephas and Huxoll stood at the
driver's side of the car.  (Tr. at 25-26.)  Schuler and Rollins
stood at the passenger side.  (Tr. at 25-26.)  Cephas was dressed
in plain clothes, but each officer wore a blue and gold
Metropolitan Police Department raid jacket bearing a badge on the
left breast pocket of the jacket.  (Tr. at 11, 37.)  The words
"Metropolitan Police Department" appeared on the back of each
jacket and the letters "MPD" appeared on the sleeves of each
jacket.  (Tr. at 37.)

Jones was seated in the front passenger seat with the window
down.  (Tr. at 5, 7.)  At that time, Cephas saw no illegal
activity, nor did he believe any other officer mentioned seeing
any evidence of illegal activity.  (Tr. at 26-27.)  Cephas did
not see Jones make any furtive gestures or any movements as if he
were putting a gun under his seat, nor did he believe any other
officer mentioned seeing such movements.  (Tr. at 19-20.)
Schuler asked Jones if there were any weapons in the vehicle.
(Tr. at 5.)  Cephas, standing on the other side of the car, could
not hear Schuler's question.  (Tr. at 40.)  It was not noisy
outside.  (Tr. at 40.)  Jones answered, "All I have is this bag

---

[1] At the hearing, Cephas demonstrated the walk to the car.
His pace appeared deliberate but did not convey haste or rushing.

- 4 -

of weed," and Jones handed Schuler a ziploc containing a green weed. (Tr. at 5, 9, 28.) Schuler told Jones to get out of the car. (Tr. at 28.) Schuler got Jones to put Jones's hands on the car and Schuler attempted to handcuff Jones. (Tr. at 5-6.) Jones pushed Schuler, broke free, and fled from the car. (Tr. at 5-6.) Cephus chased Jones without success. (Tr. at 5-6.)

Huxoll put his head in the open window of the front passenger door and saw a gun protruding from under the front passenger seat. (Tr. at 30-31.) When Cephas returned to the Delta 88 and learned of the gun, he was able to see the grip of the gun by putting his head in the same window of the car. (Tr. at 8, 30-31.) Officers later recovered from the glove compartment of the Delta 88 a scale and 55 ziplocs of white rock which tested positive for cocaine. (Tr. at 33.) They also determined that the car was registered to a Charnita Chandler. (Tr. at 35.)

Following Cephas's testimony, the court asked the government whether it had any other evidence, and the government replied that it did not. (Tr. at 46.) The court expressed concern regarding all of the key questions to which Cephas did not know the answer bearing on whether a consensual police-citizen encounter or seizure had occurred, such as whether any approaching officer brandished a weapon or handcuffs, whether officers issued other commands to Jones or asked Jones other

questions, whether officers asked for and retained Jones's
identification, and what tone of voice Schuler used in
questioning Jones.  (<u>See</u> Tr. at 61-62, 65, 70-71.)  The
government did not ask to supplement the record or continue the
hearing.

DISCUSSION

Generally, "[t]he proponent of a motion to suppress has the
burden of establishing that his own Fourth Amendment rights were
violated by the challenged search or seizure." <u>Rakas v.
Illinois</u>, 439 U.S. 128, 132 n.1 (1978)(citations omitted).
However, "if a defendant produces evidence that he was arrested
or subjected to a search without a warrant, the burden shifts to
the government to justify the warrantless arrest or search."
<u>United States v. de la Fuente</u>, 548 F.2d 528, 533 (5th Cir. 1977);
see <u>United States v. Carhee</u>, 27 F.3d 1493, 1496 (10th Cir.
1994)("As to the warrantless encounter, [defendant] bears the
burden of proving whether and when the Fourth Amendment was
implicated. . . . The government then bears the burden of proving
that its warrantless actions were justified . . . .") (footnotes
omitted); 6 Wayne LaFave, <u>Search and Seizure: A Treatise on the
Fourth Amendment</u> § 11.2(b)(4th ed. 2004)("if the search or
seizure was pursuant to a warrant, the defendant has the burden
of proof; but if the police acted without a warrant the burden of
proof is on the prosecution").

Here, the defendant's burden of showing that he was subject to a warrantless seizure was met. Cephas testified that Schuler told Jones to get out of the car, at which point Schuler attempted to handcuff Jones and place him under arrest.   The officers did not obtain a warrant before taking this action. Furthermore, the government conceded at the motions hearing that Jones was seized at the time the officers were placing him under arrest.   (Tr. at 78.)   Therefore, the government bears the burden of justifying this warrantless seizure.   The government argues that the seizure was lawful because the encounter between the defendant and the officers was initially consensual or voluntary, and probable cause to arrest the defendant for possession of marijuana arose when the defendant handed Schuler the ziploc containing a green weed.   (Tr. at 59-60.)   The defendant argues that he was seized without justification as soon as the officers arrived at the car, and that the statements and physical evidence derived from that point forward are tainted fruits that must be suppressed.   (Tr. at 49, 58-59.)

I.   LAWFULNESS OF THE SEIZURE

A.   Consensual Police-Citizen Encounter

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is

willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." Florida v. Royer, 460 U.S. 491, 497 (1983)(plurality opinion)(citations omitted).

The "crucial test" for determining whether police conduct crosses the threshold from a consensual police-citizen encounter to a seizure or forcible stop is "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Florida v. Bostick, 501 U.S. 429, 437 (1991)(quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988)).

A court's analysis should "take[] into account all the objective circumstances of the encounter . . . ." United States v. Lewis, 921 F.2d 1294, 1297 (D.C. Cir. 1990). Relevant factors in this analysis of whether the encounter was consensual include "the time of day, the place, the officer's tone of voice, and whether the officer displayed a weapon or handcuffs, wore a uniform, touched the individual without permission, threatened or physically intimidated him, or retained his identification[,]" id., what if any commands officers gave to the individual during the encounter, the number of officers involved in the encounter, the number of officers involved in the encounter, and whether the officers blocked the individual's path of exit. See, e.g.,

<u>United States v. Drayton</u>, 536 U.S. 194, 195 (2002) (considering
facts that there were no threats or commands given, nor were
exits blocked, during the encounter); <u>United States v. Wood</u>, 981
F.2d 536, 543 (D.C. Cir. 1992)(noting that during encounter,
officers were positioned such that defendant's movement was
restricted in apartment entranceway, and that officer told
defendant to stop); <u>United States v. Tavolacci</u>, 895 F.2d 1423,
1425 (D.C. Cir. 1990)(considering fact that although three
officers were present, defendant could see only two).  While this
list is not exhaustive, the D.C. Circuit has required
consideration of these factors.  The absence of evidence and
findings concerning key factors in the analysis can preclude a
holding that a warrantless police-citizen encounter was
consensual.  <u>See, e.g.</u>, <u>Florida v. Bostick</u>, 501 U.S. at 437-40
(declining to determine whether a seizure occurred and remanding
because state trial court made no express findings of fact and
state Supreme Court made decision based on a single fact rather
than a totality of the circumstances); <u>United States v. Jordan</u>,
951 F.2d 1278, 1283 (D.C. Cir. 1991)(where officers could not
remember whether they saw or retained defendant's documents
during the interview, and district court did not make clear its
factual findings on this point, court remanded for
clarification).

- 9 -

Several facts surrounding the police-citizen encounter in this case could support the argument that the encounter began as a consensual one. It was 8:00 p.m. and still light outside. The officers did not block the path of the Delta 88 with the police cruiser; rather, the officers parked approximately 14 feet away. Cephas was not wearing a uniform. The officers approached the defendant at a deliberate but not hasty or rushing pace. When Schuler asked Jones whether there were any weapons in the car, Schuler's voice must have been at a moderate to low volume, because Cephas was only a car's width away and did not hear Schuler's question. There is no evidence of any threats aimed at Jones or physical contact with Jones before he handed over the ziploc.  (See Tr. at 44.)

Other facts could lend support to an argument that the encounter here did not begin as a consensual one or reasonably convey Jones's freedom to leave. There was manifestly a show of police presence and authority. Although Cephas's cruiser was unmarked, even he conceded that people in the area recognize it as a police cruiser. All of the officers wore raid jackets with police badges affixed to the front and police lettering emblazoned on the back and sleeves. It was not just one or two officers approaching a single person at a casual pace, but four approaching at a quick and deliberate pace. Officers were

stationed not just on one side of the car from which Jones could have gotten out, but on both sides.

In this case, the government has failed to produce information on the many other factors that together are critical to the analysis. Although Cephas testified that he did not give a command, such as "freeze" or "stay where you are" when he approached the Delta 88 (Tr. at 20), Cephas did not know if Schuler, Rollins or Huxoll gave any commands to Jones related to officer safety prior to Schuler asking if there were any weapons in the car. (Tr. at 25.) Cephas did not recall whether any officers brandished their handguns or any handcuffs in Jones's presence before Schuler asked his question. (Tr. at 20, 36-37.) Cephas did not know if anyone demanded that Jones produce identification before Schuler asked his question. (Tr. at 27.) Cephas did not know if Schuler or any other officer said anything to Jones before Schuler's question. (Tr. at 22-33.) Notably, unlike in other consensual encounter cases, the government here did not prove that officers asked the citizen if he would mind answering questions before questioning began.[2] Cephas did not

---

[2] Cf. Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984)(holding that initial contact between officers and individual, during which officers asked individual if he would step aside and talk with them, was a consensual encounter); United States v. Maragh, 894 F.2d 415, 415-16, 419 (D.C. Cir. 1990)(finding no stop or seizure where two drug interdiction officers approached defendant after he embarked from train, and one identified himself as a police officer and asked defendant if he would answer some questions); Tavolacci, 895 F.2d at 1425 (finding that encounter

know with what tone of voice Schuler asked his question.  (Tr. at
39-40.)  Furthermore, the government did not establish at what
distance from the Delta 88, or in what respective positions, the
officers stood when they reached it.  Specifically, it did not
establish whether Schuler and Rollins stood in such a way as to
not block Jones's egress when Schuler questioned Jones.

Because the government did not present any evidence on
whether the other three officers issued any commands to Jones,
whether they displayed weapons or handcuffs, whether they
demanded identification, what Schuler's tone of voice was, and
whether Jones's path to leave was not blocked, the government has
failed to carry its burden of production as to factors crucial to
the totality of the circumstances analysis.  It cannot be that
the government may satisfy its burden simply by calling a
percipient witness who does not know or recall the material
facts.  In failing to carry the burden of producing evidence on
these factors, the government has thus failed to carry its burden
of proof that this encounter began as a consensual one.

B.  Terry Stop

Although the government has not justified the warrantless
police seizure of Jones by showing that it stemmed from a
consensual encounter, a warrantless seizure may also be justified

in which detective approached defendant on train, identified
himself, and asked permission to ask some questions was not a
seizure).

if it is the result of a lawful investigative stop under Terry v.
Ohio, 392 U.S. 1 (1968). A law enforcement "officer may briefly
detain a citizen if he has a reasonable, articulable suspicion
that 'criminal activity may be afoot.'" United States v.
Edmonds, 240 F.3d 55, 59 (D.C. Cir. 2001) (quoting Terry, 392
U.S. at 30). The Terry stop "requires only a 'minimal level of
objective justification.'" Edmonds, 240 F.3d at 59 (quoting INS
v. Delgado, 466 U.S. 210, 217 (1984)). "Reasonable suspicion is
not a finely-tuned standard; instead it is a fluid concept that
derives substantive content from the particular context in which
it is being assessed. The standard is dependent on both the
content of information possessed by police and its degree of
reliability and requires a showing considerably less than
preponderance of the evidence." United States v. Holmes, 360
F.3d 1339, 1341-42 (D.C. Cir. 2004), vacated and remanded on
other grounds, 125 S. Ct. 1046 (2005)(internal quotation marks
and citations omitted). "To support an investigative stop, it is
sufficient that the facts present and the rational inferences to
which these facts give rise, reasonably warrant the
intrusion . . . ." United States v. Savage, 889 F.2d 1113, 1118
(D.C. Cir. 1989) (citing Terry, 392 U.S. at 21). To determine
whether the facts warrant the intrusion, a court must look to the
totality of the circumstances. See id.

- 13 -

In order to assess the reasonableness of such a warrantless
stop, "as a general proposition, it is necessary 'first to focus
upon the governmental interest which allegedly justifies official
intrusion upon the constitutionally protected interests of the
private citizen,' for there is 'no ready test for determining
reasonableness other than by balancing the need to search (or
seize) against the invasion which the search (or seizure)
entails.'"  Terry, 392 U.S. at 20-21 (quoting Camara v. Mun.
Court, 387 U.S. 523, 534-35, 536-37 (1967)); see United States v.
Hensley, 469 U.S. 221, 229 (1985) ("[W]here police have been
unable to locate a person suspected of involvement in a past
crime, the ability to briefly stop that person, ask questions, or
check identification in the absence of probable cause promotes
the strong government interest in solving crimes and bringing
offenders to justice.").  "[I]n justifying the particular
intrusion [a] police officer must be able to point to specific
and articulable facts which, taken together with rational
inferences from those facts, reasonably warrant that intrusion."
Terry, 392 U.S. at 21.  Such an assessment looks at whether,
judged against an objective standard, "the facts available to the
officer at the moment of the seizure or the search 'warrant a man
of reasonable caution in the belief' that the action taken was
appropriate[.]"  Id. at 21-22 (quoting Carroll v. United States,
267 U.S. 132, 162 (1925)); see United States v. Thompson, 234

- 14 -

F.3d 725, 728 (D.C. Cir. 2000) ("Whether [the reasonable articulable suspicion] standard is met must be determined from the standpoint of an objectively reasonable police officer, without reference to the actual motivations of the individual officers involved.") (internal quotation marks omitted). "[S]imple 'good faith on the part of the arresting officer is not enough.'"  Terry, 392 U.S. at 22 (quoting Beck v. Ohio, 379 U.S. 89, 97 (1964)).  "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."  United States v. Arvizu, 534 U.S. 266, 274 (2002) (internal quotation marks omitted).

The facts in this case do not bear out a reasonable, articulable suspicion of criminal activity necessary to conduct a lawful Terry stop, nor has the government pressed the argument that a lawful Terry stop occurred.[3]  The 100 block of Yuma Street is a "high narcotic area," and a location's status as a high-crime area can be among the considerations relevant to the Terry analysis.  However, "an individual's presence in such an area,

---

[3] The government did not argue in its written opposition to Jones's suppression motion that the encounter was a lawful Terry stop supported by reasonable, articulable suspicion. Furthermore, at the motions hearing, the government conceded that there is "very little" to justify a Terry stop in this case. (See Tr. at 72-73.)

'standing alone, is not enough to support reasonable,
particularized suspicion that the person is committing a crime.'"
United States v. Brown, 334 F.3d 1161, 1165 (D.C. Cir. 2003),
cert. denied, 124 S. Ct. 1702 (2004) (quoting Illinois v.
Wardlow, 528 U.S. 119, 124 (2000)); see Edmonds, 240 F.3d at 60.

Lucas walked away from the parked Delta 88 very quickly.
"[U]nprovoked flight upon noticing the police" can be a relevant
consideration in the Terry analysis, and coupled with a
defendant's presence in a high-crime area, can justify a Terry
stop.  See Wardlow, 528 U.S. at 124-25 (concluding that officer
was justified in suspecting that defendant was involved in
criminal activity where defendant was present in an area of heavy
narcotics trafficking and fled, unprovoked, upon noticing the
police).  "[N]ervous, evasive behavior is a pertinent factor in
determining reasonable suspicion" and "[h]eadlong flight . . . is
the consummate act of evasion . . . ."  Id. at 124.  See also
California v. Hodari D., 499 U.S. 621, 624 n.1 (1991) ("That it
would be unreasonable to stop, for brief inquiry, young men who
scatter in panic upon the mere sighting of the police is not
self-evident, and arguably contradicts proverbial common
sense.");  Brown, 334 F.3d at 1167 ("circumstance supporting the
officers' reasonable suspicion and fear was the activity of the
man who got out of the black car, watched the officers for a
while, and then disappeared down the alley"; officer testified

- 16 -

that the behavior was "'peculiar,'" that the man "'seemed to be

eyeing out my partner and myself'" and "'sizing us up'"); United

States v. Williams, 816 F. Supp. 1, 10 (D.D.C. 1993) (considering

in Terry analysis "the fact that defendant, who was talking to

someone, immediately turned around and walked away when [the

officer] approached him"). Yet, in this case, there is no

evidence that Lucas fled upon noticing the police. Cephas never

said that Lucas saw the police officers, who were 40 to 50 yards

away, or that Lucas even looked in their direction before walking

away from the Delta 88. Indeed, Cephas never said that Lucas

fled, but merely that Lucas walked away very quickly from the

car.[4] Furthermore, Cephas did not describe either Lucas's or

Jones's behavior as nervous, evasive, or peculiar. Cf. Brown,

334 F.3d at 1163. The government counters, however, that Cephas

knew Lucas and Jones from patrolling that beat. (Tr. at 4, 18,

73-74.) The government provided no information, though, of any

knowledge Cephas had of Lucas or Jones that added or gave rise to

any reasonable, articulable suspicion of unlawful activity on the

scene on May 8, 2002. Cephas said he could not be sure he had

even been involved in any prior police activity with either one

of them. (Tr. at 18-19.)

---

[4] Defense counsel prefaced questions to Cephas with
characterizations of Lucas's behavior as flight, but Cephas's own
descriptions were consistent throughout his examination. Indeed,
the only person who Cephas said "fled" was Jones. (Tr. at 6.)

- 17 -

Other factors that are sometimes found to justify a <u>Terry</u>
stop are absent here.  The incident did not take place late at
night.  (Tr. at 17, 37.)  <u>Cf.</u> <u>Brown</u>, 334 F.3d at 1165 ("The
importance of [the fact that the incident took place in a high
crime area] is further compounded by the lateness of the hour.").
There was no report that gunshots had been fired or any tip that
illegal activity was occurring.  <u>Cf.</u> <u>id.</u> (finding that another
relevant factor in the <u>Terry</u> analysis was a report that gunshots
had been fired from parking lot); <u>Holmes</u>, 360 F.3d at 1342-46
(finding reasonable suspicion to conduct <u>Terry</u> stop where, among
other factors, officers received tip from pedestrian).  Cephas
did not observe any illegal activity occurring as he approached
the Delta 88, and he did not believe that any other officers
indicated seeing any illegal activity as they approached the
Delta 88.  Cephas did not see Jones make any furtive gesture or
reach under his car seat, and there is no evidence that any other
officer saw such movements.  <u>Cf.</u> <u>Edmonds</u>, 240 F.3d at 61 (finding
relevant officer's testimony that he noticed defendant reaching
under driver's seat as though attempting to conceal something).

In sum, officers saw from a distance a man in the light of
day get out of a car lawfully parked in a high narcotics area and
walk away quickly leaving a passenger in the car.  These
circumstances do not present a reasonable, articulable suspicion

- 18 -

of illegal activity that would justify stopping and questioning the passenger.[5]

   C.  Probable Cause

   Facts that fail to establish a reasonable, articulable suspicion of unlawful activity cannot suffice to establish probable cause to believe a crime has been committed.  See, e.g., United States v. $53,082.00 in United States Currency, 985 F.2d 245, 249 (6th Cir. 1993)(noting that "the facts held by the agents did not establish reasonable articulable suspicions; therefore, they surely do not show probable cause").  The government argues, and the defendant does not dispute, that once Jones answered Schuler's question by handing over the ziploc containing a green weed, the officers had probable cause to arrest Jones.  (See Tr. at 78, 81.)  However, this later-recovered ziploc cannot be relied upon either to establish reasonable suspicion to justify the police intrusion upon Jones's liberty in the first place or to conclude that the questioning of Jones occurred with his prior consent.  See Ybarra v. Illinois, 444 U.S. 85, 93 n.5 (1979)(finding that initial patdown of Ybarra was not justified under Fourth and Fourteenth Amendments because it was not supported by a reasonable belief that Ybarra was armed and dangerous, and thus concluding that they "need not decide

---

[5] While the circumstances would pose no bar to the officers attempting a consensual encounter with Jones, the government has failed to establish that such an encounter occurred here.

- 19 -

whether or not the presence on Ybarra's person of 'a cigarette
pack with objects in it' yielded probable cause to believe that
Ybarra was carrying any illegal substance").

II.   FRUITS OF UNLAWFUL SEIZURE

The exclusionary rule bars the admission of evidence seized
in violation of the Fourth Amendment and evidentiary fruits of
the illegal seizure.   See Wong Sun v. United States, 371 U.S.
471, 484-88 (1963).

> "The essence of [an exclusionary rule] forbidding the
> acquisition of evidence in a certain way is that not
> merely evidence so acquired shall not be used before
> the Court but that it shall not be used at all.   Of
> course this does not mean that the facts thus obtained
> become sacred and inaccessible.   If knowledge of them
> is gained from an independent source they may be proved
> like any others, but the knowledge gained by the
> Government's own wrong cannot be used by it in the way
> proposed."

Id. at 485 (quoting Silverthorne Lumber Co. v. United States, 251
U.S. 385, 392 (1920)).

The exclusionary rule reaches physical evidence as well as
statements.   See id. at 485-86 (holding that "the Fourth
Amendment may protect against the overhearing of verbal
statements as well as the more traditional seizure of 'papers and
effects,'" and noting, "[n]or do the policies underlying the
exclusionary rule invite any logical distinction between physical
and verbal evidence").   Cf. Oregon v. Elstad, 470 U.S. 298, 306
(1985)(holding that the Wong Sun doctrine applies when the fruit
of the Fourth Amendment violation is a confession, explaining

that "[i]t is settled law that a confession obtained through
custodial interrogation after an illegal arrest should be
excluded unless intervening events break the causal connection
between the illegal arrest and the confession so that the
confession is sufficiently an act of free will to purge the
primary taint")(internal quotation omitted).

Here, the government failed to meet its burden of justifying
under the Fourth Amendment the police intrusion upon Jones's
liberty.  It has failed to show that the encounter was either
consensual, or supported by reasonable, articulable suspicion of
unlawful activity, or justified by probable cause.  Because the
government has not shown that the defendant's act of handing over
the ziploc of alleged marijuana and his statement that "[a]ll I
have is this bag of weed" stemmed from a consensual encounter
between Jones and the officers, or from a lawful detention of
Jones, the ziploc and its contents and Jones's statement must be
suppressed as evidence obtained from an unlawful seizure.  See
United States v. Montgomery, 561 F.2d 875, 877-78 (D.C. Cir.
1977)(where officers conducted a vehicle stop, discovered an
outstanding traffic warrant on the driver and subsequently
arrested him and searched the vehicle, court held that the
vehicle stop was not sufficiently based on articulable suspicion
or justified as part of a systematically random program of

traffic stops, and that all evidence recovered as a result of the
stop must be suppressed).

III.   STANDING TO MOVE TO SUPPRESS ITEMS FOUND IN VEHICLE

Jones has also moved to suppress the weapon, ammunition, and
cocaine recovered from the Delta 88 after he fled from his
encounter with the police officers.  Under <u>Rakas v. Illinois</u>, 439
U.S. 128 (1978), the defendant "bears the burden on [his] motion
to suppress of establishing not only that the search was
unlawful, 'but also that he had a legitimate expectation of
privacy'" in either the car searched or the items seized.   <u>United
States v. Zabalaga</u>, 834 F.2d 1062, 1065 (D.C. Cir. 1987)(quoting
<u>Rawlings v. Kentucky</u>, 448 U.S. 98, 104 (1980)).

In <u>Zabalaga</u>, the court upheld the denial of a motion to
suppress evidence seized from a locked safe found in a car when
the defendant failed to establish that he owned or leased the
car, failed to provide evidence that he drove the car or had
permission to do so, disclaimed ownership of the vehicle at the
time of the arrest, and did not assert that he had any claim to
personal goods stored in the car or that there were personal
markings on any of the goods in the car that would suggest his
legitimate expectation of privacy in the car or the safe.  834
F.2d at 1064-65.  Similarly, in <u>United States v. Mitchell</u>, the
court upheld the denial of a motion to suppress drugs found in a
car in which the defendant was a passenger, finding that the

- 22 -

defendant lacked a legitimate expectation of privacy in the car
or in the drugs placed within it.   951 F.2d 1291, 1293, 1298-99
(D.C. Cir. 1991)(explaining that the defendant was merely a
passenger who had been picked up to go for a ride in a car that
was purchased by another individual that day, and the drugs found
in the car were not marked or wrapped in such a way as to suggest
ownership, an intent to exclude others, or to hide the identity
of the contents).

     Likewise, Jones has failed to demonstrate a legitimate
expectation of privacy in the vehicle or items recovered from it.
Jones was a passenger in the car that was searched, as were the
defendants in Zabalaga and Mitchell.   Jones introduced no
evidence to show that he owned the car, and the evidence was that
the car was registered to a third person.   Jones offered no
evidence to show that he drove the car or had permission to do
so, nor did he show evidence of any possessory interest in the
car's contents.

     However, Zabalaga and Mitchell each involve claims that the
search of the vehicle or compartments within it was unlawful.[6]
See Mitchell, 951 F.2d at 1294, 1296; Zabalaga, 834 F.2d at 1064.

---

     [6] In Mitchell, one defendant challenged both the search of
his person and the search of his car, but the court upheld the
search of his person under Terry, thus not reaching the argument
that because of the unlawful search of his person, none of the
subsequently discovered evidence was admissible.   See 951 F.2d at
1294-96.

- 23 -

By contrast, Jones here argues that he was unlawfully stopped and seized, and thus the contents of the Delta 88 should be suppressed as the fruits of that unlawful seizure. (Tr. at 49, 58-59.) Although Jones does not own the vehicle that was searched, "as a passenger [he] may still 'challenge the stop and detention and argue that the evidence should be suppressed as fruits of illegal activity.'" <u>United States v. Ameling</u>, 328 F.3d 443, 447 n.3 (8th Cir. 2003)(quoting <u>United States v. Lyton</u>, 161 F.3d 1168, 1170 (8th Cir. 1998)); <u>see</u> <u>United States v. Evlicio-Montoya</u>, 70 F.3d 1158, 1164 (10th Cir. 1995) (distinguishing passenger standing to directly challenge a vehicle search from passenger standing to seek suppression of evidence discovered in a vehicle as the fruit of an unlawful stop, detention, or arrest). One commentator has explained the distinction as follows:

> [It] is important to note, as the concurring opinion in <u>Rakas</u> takes great pains to emphasize, that the 'petitioners do not challenge the constitutionality of the police action in stopping the automobile in which they were riding; nor do they complain of being made to get out of the vehicle,' so that the question before the Court was 'a narrow one: Did the search of their friend's automobile after they had left it violate any Fourth Amendment right of the petitioners?' This would indicate, as two-thirds of the Court . . . recognize, that a passenger <em>does</em> have standing to object to police conduct which intrudes upon his Fourth Amendment protection against unreasonable seizure of his person. If either the stopping of the car, the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations and to have

- 24 -

suppressed any evidence found in the car which is their
fruit.

See 6 Wayne LaFave, <u>Search and Seizure: A Treatise on the Fourth
Amendment</u> § 11.3(e)(4th ed. 2004)(footnotes omitted).

In <u>Eylicio-Montoya</u>, the Tenth Circuit considered whether the
defendant, a passenger in a Dodge pickup that was stopped and
searched by police officers, had standing to challenge the search
of the Dodge and her arrest, and whether the evidence recovered
from the Dodge should be suppressed as the fruit of the poisonous
tree.   70 F.3d at 1160-62.   The court held that although the
defendant did not have standing to directly challenge the search
of the Dodge, she did have standing to challenge the initial stop
and subsequent arrest.   <u>Id.</u> at 1162-64.   Finding that the
defendant was arrested in violation of the Fourth Amendment, the
court then considered whether the evidence discovered in the
Dodge was the fruit of her unlawful arrest, explaining that "a
passenger has standing to challenge a constitutionally improper
traffic stop, detention, or arrest on Fourth Amendment grounds
even though, when the seizure occurs, she has no possessory or
ownership interest in either the vehicle in which she is riding
or in its contents."   <u>Id.</u> at 1164-67 (ultimately finding that the
car search "did not result from the exploitation of information
obtained through an illegal arrest but rather from an observation
that the agents would have made had there been no Fourth
Amendment violation" and thus that the evidence found in the

Dodge was not the fruit of the unlawful arrest).  Similarly,
although Jones has not established standing to challenge the
search of the Delta 88, he does have standing to challenge his
warrantless seizure, which the government has failed to justify
under the Fourth Amendment.  Thus, Jones is not precluded from
seeking suppression of all of the evidence which is a fruit of
this unlawful encounter.

        To determine the admissibility of evidence obtained through
a chain of causation that began with illegal police action, the
test is "whether, granting establishment of the primary
illegality, the evidence to which instant objection is made has
been come at by exploitation of that illegality or instead by
means sufficiently distinguishable to be purged of the primary
taint."  Wong Sun, 371 U.S. at 487-88 (internal quotation marks
omitted); see United States v. Ienco, 182 F.3d 517, 526 (7th Cir.
1999); United States v. Boone, 62 F.3d 323, 325 (10th Cir. 1995).

        The Supreme Court in Brown v. Illinois identified three
factors by which a court may determine if seized evidence has
been purged of the taint of the original illegality:  (1) the
lapsed time between the illegality and the acquisition of the
evidence, (2) the presence of intervening circumstances, and
(3) the purpose and flagrancy of the official misconduct.  Ienco,
182 F.3d at 526; Boone, 62 F.3d at 325-26; see Brown v. Illinois,

422 U.S. 590, 603-04 (1975).  The burden of showing admissibility
rests on the government.  See Brown, 422 U.S. at 604.

Regarding the lapsed time factor, the government here has
not shown evidence of a significant lapse in time between the
officers' initial unjustified encounter with Jones and the
discovery of the evidence in the Delta 88.  Cf. Ienco, 182 F.3d
at 526-27 (finding that the four-hour lapse between the formal
arrest and the search of the police car which ultimately yielded
the evidence did not conclusively weigh in favor of attenuation);
United States v. King, 990 F.2d 1552, 1564 (10th Cir. 1993)
("Given that [the defendant] discarded the drugs during the
course of the unlawful seizure, and [the officer] almost
immediately retrieved the drugs after being alerted by a
bystander, the 'temporal proximity' between the Fourth Amendment
violation and [the defendant's] discarding of the evidence weighs
heavily in support of a finding that the drugs were the fruit of
the unlawful seizure.").

The second factor, whether any intervening event occurred
between the officers' initial encounter with Jones and the
discovery of the evidence in the Delta 88, is most relevant to
the current analysis.  The government contends that Jones
abandoned the contents of the car when he ran away and therefore
has no standing to move to suppress those contents.  "While it is
true that a criminal defendant's voluntary abandonment of

evidence can remove the taint of an illegal stop or arrest, it is equally true that for this to occur, the abandonment must be truly voluntary and not merely the product of police misconduct." Boone, 62 F.3d at 326; see King, 990 F.2d at 1564 (when government asserts that defendant's act of abandonment is a sufficient intervening circumstance to purge the taint of a Fourth Amendment violation, "the voluntariness of the defendant's act is a 'threshold requirement'")(quoting Brown, 422 U.S. at 604); cf. United States v. Wood, 981 F.2d 536, 541 (D.C. Cir. 1992) (explaining that "[o]nce an illegal seizure is established, the Government has the burden of proving that the causal chain was sufficiently attenuated by an independent act to dissipate the taint of the illegality," and holding that the government failed to prove that defendant's act of discarding gun was independent of illegal seizure).

For example, in King, after determining that the police had unreasonably detained the defendants, the Tenth Circuit addressed the question of whether drugs that one of the defendants had discarded were the fruit of this unlawful detention. 990 F.2d at 1563. Police officers had stopped two individuals in their vehicle, and while the officers were securing one individual, the other removed a bag from her pants containing drugs and dropped it in a nearby utility box. Id. at 1555. The government contended that the defendant voluntarily abandoned the drugs, and

- 28 -

that this act was a sufficient intervening event to purge the taint of the unlawful detention. Id. at 1563. In upholding the district court's ruling suppressing the discarded drugs as fruit of the unlawful detention, the court held that the act of discarding the drugs was not a voluntary abandonment sufficient to purge the taint of the Fourth Amendment violation. See id. at 1564-65.

Similarly, in United States v. Wilson, a man was approached by police at an airport, and after repeatedly attempting to avoid engaging in further conversation, the individual started running from the police, tossed a coat in the air, and was subsequently caught by the officers, who had chased him. 953 F.2d 116, 118-19 (4th Cir. 1991). In reversing the district court's decision finding admissible the drugs found in the coat, the Fourth Circuit held that the individual's "actions immediately prior to his arrest did not amount to an abandonment such as would purge the taint from the police conduct." Id. at 127. The court explained that "the purported abandonment of the coat . . . occurred after he had been illegally seized," and thus the defendant's "action was clearly the direct result of the illegal seizure, and it follows that the recovered drugs were the fruit of the illegality and must be suppressed." Id.; see also United States v. Eaglin, 759 F. Supp. 25, 26-28, 27 n.1 (D.D.C. 1991)(as officers approached defendant, he threw bag containing narcotics

- 29 -

into the air, and government claimed that he lacked standing to move to suppress bag of drugs because he abandoned it; court held that an unlawful seizure took place before defendant discarded the bag, and as such, lack of standing argument premised on abandonment theory failed); United States v. Foster, 566 F. Supp. 1403, 1408, 1413 (D.D.C. 1983)(during encounter with police, defendant returned to his car, retrieved shotgun, walked away and dropped gun in grassy area before returning to car, court found that "defendant's abandonment of the shotgun was a direct result" of the officer's illegal conduct and thus "the seizure of the weapon was tainted with illegality").[7]

Here, the evidence of abandonment is Cephas's testimony that after Schuler got Jones out of the car and was attempting to handcuff him, Jones pushed Schuler, broke free, and fled from the car. (Tr. at 5-6.) The government did not present any evidence suggesting that Jones's flight was triggered by anything other than the unjustified encounter and police questioning. The government has not carried its burden of proving that the cause of the officers' discovery of contraband in the Delta 88 was

---

[7] By contrast, in Boone, following a traffic stop where an officer unlawfully searched a car without a warrant or consent, the defendants, whom the officer testified were free to leave, sped off and threw bottles of PCP out of the car window during the ensuing police chase. 62 F.3d at 324-26. The Tenth Circuit found that defendants' decision to discard evidence was an "independent and voluntary" one, and was an intervening circumstance "sufficient to cut the link to [the officer's initial illegal search]." Id. at 326.

- 30 -

sufficiently attenuated by an independent and voluntary
abandonment of the car by Jones so as to dissipate the taint of
the unjustified police seizure of Jones, or that the discovery of
contraband was not a product of the unjustified police seizure.
Furthermore, the government did not present evidence of any other
intervening circumstance that might have operated to dissipate
the taint of the initial encounter.

The third factor is the purpose and flagrancy of the
official misconduct.  For example, in Boone, where "the police
officer acted upon a mistaken belief that [the defendant] had
consented to [a] search," the error did constitute a Fourth
Amendment violation but "[did] not qualify as flagrant misconduct
that would tilt the scales against attenuation."  62 F.3d at 325.
Similarly, here there is no evidence to suggest that the initial
questioning of Jones, his seizure, or the search of the Delta 88
were flagrant or purposeful.  However, "the lack [of] such
misconduct is of no moment [where] there [is] no intervening
event to break the connection" to the initial police misconduct.
Ienco, 182 F.3d at 528.

Thus, because what little the government presented did not
establish how the connection between the officers' unjustified
encounter with Jones and the officers' discovery of the
contraband in the Delta 88 was severed, the weapon, ammunition,
and cocaine recovered from the Delta 88 must be suppressed.

- 31 -

## CONCLUSION AND ORDER

Here, the government failed to meet its burden of justifying under the Fourth Amendment the warrantless seizure of Jones. It has failed to show that the police officers' encounter with Jones was consensual, or that it began supported by reasonable, articulable suspicion of unlawful activity or by probable cause. Therefore, the ziploc of alleged marijuana and the statement by Jones, "[a]ll I have is this bag of weed," must be excluded as evidence obtained from an unlawful seizure. Because Jones's flight from the car and the police did not dissipate the taint of the initial illegality, the weapon, ammunition, and cocaine found in the car also must be suppressed. Therefore, it is hereby

ORDERED that the defendant's motion to suppress [10] be, and hereby is, GRANTED. The ziploc of alleged marijuana, the statement by Jones, the weapon, the ammunition, and the cocaine will be suppressed at trial. It is further

ORDERED that parties appear for a status hearing in this case on June 27, 2005 at 11:15 a.m.

SIGNED this 20th day of June, 2005.

                              /s/
                    RICHARD W. ROBERTS
                    United States District Judge